

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-11-00907-CR

Lavelle **SIMPSON**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 227th Judicial District Court, Bexar County, Texas
Trial Court No. 2009CR7681
Honorable Philip A. Kazen, Jr., Judge Presiding

Opinion by:    Catherine Stone, Chief Justice

Sitting:    Catherine Stone, Chief Justice
Sandee Bryan Marion, Justice
Rebecca Simmons, Justice

Delivered and Filed:  December 31, 2012

AFFIRMED

Lavelle Simpson waived his right to a jury trial, and the trial judge found him guilty of

the offense of felon in possession of a firearm.  On appeal, Simpson presents three points of

error.  First, Simpson challenges whether the evidence is legally sufficient to show: (1) he

exercised care, custody, control, or management over the firearm; (2) he voluntarily possessed

the firearm; and (3) he possessed the requisite culpable mental state.  Next, Simpson asserts he

was not permitted to present evidence or a defense in violation of his rights to due process of law

and a fair trial. Finally, Simpson complains the trial court erred in failing to set aside the indictment because he was denied his constitutional right to a speedy trial.

## BACKGROUND

On April 4, 2009, Simpson was arrested for being a felon in possession of a firearm, and he was bonded out of jail the following day. David McLane, who represented Simpson at trial and now on appeal, was appointed as counsel on April 6, 2009. On July 20, 2009, the grand jury indicted Simpson for possessing a firearm within five years of being released from confinement or supervision for a felony conviction.[1] On January 11, 2010, the trial court called Simpson's cause, but Simpson failed to appear. As a result, a capias was issued for Simpson's arrest on January 14, 2010, and Simpson was arrested on February 3, 2010. This time Simpson did not post bond, and he was not released from jail. The record does not indicate the date, but some time while in jail Simpson was indicted on a separate charge of murder. On June 9, 2010, Simpson was appointed separate counsel to assist in the defense of the murder charge.

On July 6, 2011, Simpson filed a pro se motion for a speedy trial. On October 12, 2011, Simpson's attorney filed a motion to set aside the indictment for failure to afford Simpson his constitutional right to speedy trial. On November 14, 2011, following a hearing, the magistrate denied the motion to set aside the indictment, but granted the motion for a speedy trial. Simpson's trial was held on November 17, 2011, and the trial court found Simpson guilty of the offense of felon in possession of a firearm with an enhancement paragraph and assessed punishment at ten years in prison and a $5,000 fine. Simpson timely filed his notice of appeal.

---

[1] Simpson has two prior convictions: one in Bexar County, Texas, in 2009 and one in the Parish of Orleans, Louisiana, in 2007.

**SUFFICIENCY OF THE EVIDENCE**

### A. Standard of Review

Pursuant to *Brooks v. State*, we no longer review claims for factual sufficiency, but instead, only review claims for legal sufficiency. *Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010) (plurality opinion). In determining whether the evidence is legally sufficient to support Simpson's conviction, we apply the standard articulated in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Id.* This standard requires us to determine whether, considering the evidence in the light most favorable to the verdict, a fact finder could rationally find the elements of the crime beyond a reasonable doubt. *Adames v. State*, 353 S.W.3d 854, 860 (Tex. Crim. App. 2011), *cert. denied*, 132 S. Ct. 1763 (2012); *Brooks*, 323 S.W.3d at 899. We measure the sufficiency of the evidence by looking to the substantive elements of the crime as defined by the hypothetically correct jury charge. *Adames*, 353 S.W.3d at 860.

Because we view the evidence in the light most favorable to the verdict, we must defer to the fact finder's credibility assessments and the weight given to the witnesses' testimony. *Brooks*, 323 S.W.3d at 899. "We will uphold the verdict unless a reasonable [fact finder] must have had a reasonable doubt as to at least one of the elements of the offense." *Runningwolf v. State*, 360 S.W.3d 490, 494 (Tex. Crim. App. 2012). "Direct and circumstantial evidence are treated equally: 'Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt.'" *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007) (quoting *Hooper v. State*, 214 S.W.3d 9, 16–17 (Tex. Crim. App. 2007)). This is because we must observe the cumulative impact of the evidence, instead of simply considering each piece of evidence in isolation. *Id.*; *Evans v. State*, 202 S.W.3d 158, 166 (Tex. Crim. App. 2006).

### B. *Elements of Felon in Possession of a Firearm*

In order to be convicted of being a felon in possession of a firearm under section 46.04(a) of the Texas Penal Code, the State must prove that the individual: (1) was convicted of a felony, and (2) possessed a firearm "after conviction and before the fifth anniversary of the person's release from confinement following conviction of the felony or the person's release from supervision under community supervision, parole, or mandatory supervision, whichever date is later." TEX. PENAL CODE ANN. § 46.04 (West 2011). The Penal Code defines possession as actual care, custody, control, or management of the item. *Id.* § 1.07(39) (West Supp. 2012). Additionally, for a felon to be held criminally responsible for possession of a firearm, the State must prove the felon voluntarily possessed the weapon. *Id.* § 6.01(a) (West 2011); *Davis v. State*, 93 S.W.3d 664, 667 (Tex. App.—Texarkana 2002, pet. ref'd). Specifically, "possession is a voluntary act if the possessor knowingly obtains or receives the thing possessed or is aware of his control of the thing for a sufficient time to permit him to terminate his control." TEX. PENAL CODE ANN. § 6.01(b).

### C. *Circumstances Must Link the Defendant to Knowing and Voluntary Possession*

When a defendant was not in exclusive possession and control of the place where the prohibited item was found, the prosecution must provide "evidence of circumstances, in addition to mere presence, that would adequately justify the conclusion that the defendant knowingly possessed the [item]." *Evans*, 202 S.W.3d at 162 n.9 (quoting Womack, J., concurring) (internal quotation marks omitted). Using either direct or circumstantial evidence, the State must prove the defendant's connection to the firearm was not fortuitous. *Id.* at 165; *Poindexter v. State*, 153 S.W.3d 402, 405–06 (Tex. Crim. App. 2005).

In determining whether the evidence sufficiently links a defendant to the contraband, Texas courts have considered the following non-exclusive list of factors: (1) the defendant's

presence when the search was conducted; (2) whether the contraband was in plain view; (3) whether the contraband was in close proximity to, or accessible by, the defendant; (4) whether the contraband was found in an enclosed place; (5) whether other contraband was found on or near the defendant when he was arrested; (6) whether the defendant made incriminating statements when arrested; (7) whether the defendant attempted to flee; (8) whether the defendant made furtive gestures; (9) whether the defendant owned or had a right to possess the place where the contraband was found; (10) whether the conduct of the defendant indicated a consciousness of guilt; (11) whether the contraband was found on the same side of the car as the defendant was sitting; (12) whether the accused had a special connection to the contraband; (13) whether the accused was observed in a suspicious area under suspicious circumstances; and (14) whether the defendant was the driver of the vehicle in which the contraband was found. *Hargrove v. State*, 211 S.W.3d 379, 385–86 (Tex. App.—San Antonio 2006, pet. ref'd); *see also Deshong v. State*, 625 S.W.2d 327, 329 (Tex. Crim. App. 1981); *Poindexter v. State*, 115 S.W.3d 295, 299 (Tex. App.—San Antonio 2003), *rev'd on other grounds*, 153 S.W.3d 402 (Tex. Crim. App. 2005); *Lassaint v. State*, 79 S.W.3d 736, 740–41 (Tex. App.—Houston 2002, no pet.). We do not base our decision on the number of links, but rather on the "logical force of all of the evidence." *Evans*, 202 S.W.3d at 162.

### D. Trial Testimony

At Simpson's trial, the State called three witnesses: Officer Jason Lemcke, Officer Jesus Sotelo, and Roxanne Rosas, a fingerprint examiner for the Bexar County Sheriff's Office. Officer Lemcke was the first witness to testify. On direct examination, Lemcke testified that he and Officer Sotelo observed Simpson, who was driving, and another individual[2] in a Chevy

---

[2] Simpson's passenger fled the scene and was never apprehended. Simpson refused to identify the passenger to police.

Malibu acting suspiciously. Lemcke recalled noticing that the demeanor of the two men inside the vehicle seemed suspicious, so the officers followed the Malibu into a neighborhood. According to Lemcke, Simpson committed a traffic violation while making a right turn into the neighborhood, but the officers did not attempt to stop the Malibu at that time. While the officers followed the Malibu in the neighborhood, the vehicle slowed down and the officers could see a lot of movement inside the vehicle. Lemcke also stated the men knew they were being followed by police, and he could "just tell that they were nervous [from] their demeanors, kind of moving in and out of the lane. Not crossing the lane, but they seemed [to be] kind of just moving inside the lane from side to side." These observations and assumptions were based on Lemcke's prior experience.

Shortly after his first traffic violation, Simpson failed to use a turn signal when making a left turn. As a result, the officers turned on the patrol car's emergency lights in an attempt to make a traffic stop. Simpson, however, did not pull over; instead, Lemcke recalled that Simpson sped up and committed at least one other traffic violation. Next, Lemcke observed Simpson and his passenger open the driver and passenger doors of the vehicle while it was still moving, as though the men were preparing to flee. According to Lemcke, Simpson then made a right turn that caused the Malibu to crash into a parked truck.

As the vehicles collided, Simpson and the passenger exited the vehicle and fled on foot. Sotelo chased Simpson, and Lemcke pursued the passenger. After realizing he was unlikely to catch the passenger, Lemcke shifted his attention to helping Sotelo catch and detain Simpson. Shortly thereafter, Simpson was apprehended and placed in handcuffs.

Lemcke testified that he then took Simpson to the patrol vehicle and searched the Malibu for other individuals or evidence. As he approached the Malibu, Lemcke saw a revolver on the dashboard in plain view. No other persons or evidence were found in the vehicle. Lemcke

recalled that the gun was between the driver and passenger sides of the vehicle, but just slightly closer to the driver's side.

On cross-examination, Lemcke added that when he first saw the Malibu, the individuals had come from an area known to have a high level of gang activity. Lemcke, however, admitted that the men had not committed any offense at the time the officers began following the Malibu. When asked about the collision, Lemcke stated the pickup truck was large and both vehicles sustained quite a bit of damage. Lemcke also clarified that he performed a frisk on Simpson and found no weapons.

Simpson's attorney then questioned Lemcke regarding his personal knowledge of Simpson's association with the gun:

> **McLane:** Now, you don't have any personal knowledge of when that gun was put on the dash, do you?
>
> **Lemcke:** No.
>
> **McLane:** You don't have any personal knowledge of where that gun was put on the dash, do you?
>
> **Lemcke:** Just from the crash—from the intertia of the revolver, I guess during the crash that propelled itself [onto] the dashboard. That's the only thing, I guess—I never seen anyone place it there, I didn't see it in their hand. It's just when we came back to actually look at the vehicle, that's when I noticed the revolver there.
>
> **McLane:** And so you don't have any personal knowledge who put the gun on the dashboard, either, do you?
>
> **Lemcke:** No.

Defense counsel then verified that there were two occupants of the vehicle and that one of them got away. Lemcke also stated the police had an opportunity to test the weapon for fingerprints, but they did not. Lemcke repeatedly acknowledged that he had no personal knowledge that Simpson put the gun on the dashboard and no personal knowledge that Simpson ever knowingly

obtained or received the firearm. Additionally, the following exchange occurred regarding

Lemcke's personal knowledge of where the gun was located in the vehicle prior to the crash:

> **McLane:** We don't know, and that's—that's the point, right? We don't know; is that correct?
>
> **Lemcke:** A lot of things could have happened with the—like I said, with the— with everything jumbling around, we don't know where the weapon was at during the time of the crash.

The State also called Officer Jesus Sotelo to testify. Sotelo's testimony mostly repeated

the events as depicted by Lemcke's testimony. After arresting Simpson, Sotelo recalled that a

frisk was conducted and nothing was found on Simpson. Like Lemcke, Sotelo testified the gun

was found on the dashboard in plain view, just left of center and closer to the driver's side.

Sotelo then testified that the driver would have been able to see the gun and, if he leaned over,

the driver could reach the gun because "it would be in the immediate area of control." It was

also reiterated that the passenger did not linger in the car after Simpson jumped out.

Sotelo further acknowledged that he had no personal knowledge that Simpson put the gun

on the dashboard or even saw it on the dashboard. The force of the impact when the vehicle

crashed was discussed relative to how the revolver may have ended up on the dashboard up

against the windshield. As Sotelo testified:

> **Sotelo:** I don't know where [the revolver] was located prior to, other than there was a—a tissue box in the backseat that ended up in the front, also. So I can only—I can only think that the gun was in an open area, it wasn't enclosed in a compartment to end up in that location after the crash.
>
> **McLane:** So there was a tissue box on the dashboard[] as well?
>
> **Sotelo:** The tissue box was on the—on the console.
>
> **McLane:** Okay. Now, you said that had come forward from the backseat?
>
> **Sotelo:** Yes.
>
> **McLane:** How did you know it was in the backseat?

**Sotelo:** Because I remember seeing a tissue box in the back—you know, that area in the back window.

. . . .

**McLane:** Okay. So things moved around that passenger compartment after the impact, fair to say?

**Sotelo:** Correct.

Sotelo went on to admit the gun was not fingerprinted, despite being in the State's control since the incident, and an absence of Simpson's fingerprints or the presence of someone else's could be exculpatory to Simpson. Sotelo repeatedly admitted he had no idea who put the revolver on the dashboard or how long the revolver was on the dashboard. He stated that:

**Sotelo:** The only thing that drew my attention is there's two occupants, driver and a passenger, both are running. And I assumed if the passenger was the one that had the gun and he left it, there would be no reason for the driver to run[,] other than for a traffic infraction, because he wasn't wanted and he had no drugs, he had nothing else that we could arrest him for at that time.

**McLane:** Your assumption is because Mr. Simpson ran, it must be his gun?

**Sotelo:** That he had knowledge that it was there.

. . . .

**McLane:** [H]e never said it was his gun, did he?

**Sotelo:** No.

**McLane:** Matter of fact, he told you it was not his gun, didn't he?

**Sotelo:** Yes. . . .

Sotelo also testified that the Malibu was registered to Keisha Wilson at 535 South Acne Road, the same address Simpson provided to police as his address.

The State's final witness, Roxanne Rosa, testified that Simpson's fingerprints matched those found in the booking records for Simpson's previous conviction of possession of a

controlled substance in a quantity of less than one gram from January 2009. After Rosa's testimony, the State rested.

After the State rested, Simpson moved for a directed verdict, arguing the State had failed to provide any evidence or any witness with personal knowledge that Simpson had voluntary and knowing possession of the firearm. The court heard arguments, asked if either side had anything else, and then found Simpson guilty of being a felon in possession of a firearm.

### E. Discussion

Applying the factors listed above leads to the conclusion that the evidence is legally sufficient. The following factors tend to link Simpson to the firearm: Simpson was present when the search was conducted; the gun was in plain view; the gun was in close proximity to, or accessible by, Simpson; the gun was not found in an enclosed place; Simpson attempted to flee; Simpson made furtive gestures; Simpson had a right to possess the place where the gun was found; Simpson's conduct indicated a consciousness of guilt; the gun was found on the same side of the car as Simpson was sitting; Simpson was observed in an area known for gang activity and acted suspiciously; and Simpson was driving the vehicle in which the gun was found.

We recognize that Simpson was not alone in the vehicle, and almost all of these factors would apply with equal force to his passenger. Nonetheless, where two equally plausible inferences can be made, reviewing courts must defer to the fact finder's decision. *Evans*, 202 S.W.3d at 164–65. Moreover, although the officers lacked personal knowledge about Simpson's possession of the gun, "circumstantial evidence alone can be sufficient to establish guilt." *Hooper*, 214 S.W.3d 9, 16–17. Accordingly, we conclude the evidence is legally sufficient to support the trial court's determination that Simpson possessed the gun.

### RIGHT TO DUE PROCESS AND A FAIR TRIAL

Simpson claims that he was denied due process and a fair trial because the trial court did not permit him to present any witnesses or evidence after the State rested its case-in-chief. Following arguments made in response to the defense's motion for a directed verdict, the trial court asked, "Anything else from the State or defense?" Simpson's counsel responded, "Nothing further, Judge." The court then found Simpson guilty as charged and stated, "My inclination at this point is to set it for a separate sentencing hearing so that you all can prepare for that, and in the meantime we can have a presentence investigation report done. Does that sound prudent to everyone?" Simpson's counsel responded, "That's fine." Simpson made no objection that he wished to put on evidence in his defense, and the proceeding ended. Simpson did, however, timely file a motion for new trial asserting he was denied due process and a fair trial because he was not allowed to put on evidence in his defense since the trial court proceeded directly to rendering its verdict after ruling on Simpson's motion for a directed verdict.

Rule 33.1(a)(1) of the Texas Rules of Appellate Procedure mandates that in order for a complaint to be preserved for appellate review, the record must reflect a timely request, objection, or motion to the trial court. TEX. R. APP. P. 33.1(a)(1). This requires the complaining party to lodge a complaint "as soon as the grounds for it become apparent." *Lackey v. State*, 364 S.W.3d 837, 843 (Tex. Crim. App. 2012) (quoting *Gillenwaters v. State*, 205 S.W.3d 534, 537 (Tex. Crim. App. 2006)) (internal quotation marks omitted). If an objection is not timely made at trial, the error is waived. *Jimenez v. State*, 32 S.W.3d 233, 235 (Tex. Crim. App. 2000) (en banc). Moreover, "[i]t has repeatedly been held that even constitutional guarantees can be waived by failing to object properly at trial." *Id.*

As far as the trial court's inquiry about whether either side had anything else, it is possible Simpson's counsel thought the court was referring to arguments on the motion for a

directed verdict. However, the trial court subsequently ruled on the verdict and discussed the sentencing hearing. Any possible confusion about whether the court's inquiry was in relation to the motion or the parties' case presentations was clear when the court stated the verdict. At this point, Simpson knew or should have known that error had occurred. *See Lackey*, 364 S.W.3d at 843. If Simpson had evidence or witnesses to present in his defense, he should have objected or otherwise informed the trial court when it was clear the court was ruling. Because he did not do so, Simpson has not preserved his point of error for appeal.

Simpson argues his complaint was preserved by his timely filed motion for new trial. In order to preserve error for appellate review, however, a timely objection normally must be made at trial. *Pearson v. State*, 994 S.W.2d 176, 179 (Tex. Crim. App. 1999) (en banc). The only similar circumstance when a motion for new trial would suffice to preserve error at trial is when a defendant is denied an opportunity to present evidence *and* an opportunity to object to the trial court's action. *Id.* at 178; *see Issa v. State*, 826 S.W.2d 159, 161 (Tex Crim. App. 1992) (en banc) (holding that a motion for new trial preserved a point of error when the trial judge announced the verdict and the sentence in one continuous statement then immediately left the bench without giving the defendant an opportunity to present sentencing evidence or object to the error). Here, the trial judge asked if the parties had anything further and asked if the parties were okay with setting a separate sentencing hearing. There can be no real argument that Simpson had no opportunity to inform the judge that he still wished to present other evidence. Further, Simpson has given no indication of what evidence or witnesses he would have presented. Accordingly, we conclude Simpson has not preserved this argument for appeal.

### RIGHT TO A SPEEDY TRIAL

Lastly, Simpson complains he was denied his right to a speedy trial under the Sixth Amendment of the United States Constitution and Article 1, section 10 of the Texas Constitution.

U.S. CONST. amend. VI; TEX. CONST. art. 1, § 10. Although the right to a speedy trial is an independent constitutional guarantee under the Texas constitution, we analyze this claim in the same way as its federal counterpart. *Zamorano*, 84 S.W.3d at 648.

### A. *Facts Pertinent to Speedy Trial Claim*

Simpson was arrested on April 4, 2009 and released on bond the following day. On January 11, 2010, Simpson was called to appear before the trial court but did not. As a result, the trial judge ordered a warrant for Simpson's arrest, and Simpson was arrested on February 3, 2010. Simpson remained incarnated until his trial on November 17, 2011 (a little over 21 months).

On July 6, 2011, Simpson filed a pro se motion for a speedy trial. On October 12, 2011, Simpson's counsel filed a motion to set aside the indictment for failure to afford Simpson his constitutional right to a speedy trial. On October 25, 2011, the trial judge referred the case to a criminal law magistrate to rule on various pretrial motions. On November 14, 2011, the criminal law magistrate held a hearing on these motions and granted Simpson's motion for a speedy trial, but denied his request to set aside the indictment. Trial was set for and occurred on November 17, 2011.

### B. **Barker v. Wingo** *Factors*

When analyzing whether a defendant's right to a speedy trial has been violated, reviewing courts must balance four factors: (1) length of the delay; (2) reasons for the delay; (3) the defendant's assertion of the right to a speedy trial; and (4) prejudice to the defendant resulting from the delay. *Barker v. Wingo*, 407 U.S. 514, 530 (1972); *Cantu v. State*, 253 S.W.3d 273, 280 (Tex. Crim. App. 2008). No single factor possesses "talismanic qualities" so no factor is either necessary or sufficient to establish a violation of the defendant's right to a speedy trial. *Barker*, 407 U.S. at 533; *Cantu*, 253 S.W.3d at 281. Rather, the factors are related

and must be considered together, along with any other relevant circumstances. *Cantu*, 253 S.W.3d at 281. This balancing test is not done in a formulaic manner, but instead, is conducted using common sense and sensitivity to the true degree the right has been infringed upon. *Barker*, 407 U.S. at 522; *Cantu*, 253 S.W.3d at 281.

Speedy trial claims are reviewed on a case-by-case basis, considering the conduct of both the prosecutor and the defendant. *Cantu*, 253 S.W.3d at 280–81; *Zamorano v. State*, 84 S.W.3d 643, 648 (Tex. Crim. App. 2002) (en banc). The State bears the burden of justifying the length of delay as well as the reasons for delay, and the defendant has the burden of showing his assertion of the right and the prejudice he suffered as a result of the delay. *Cantu*, 253 S.W.3d at 280. "The defendant's burden of proof on the latter two factors 'varies inversely' with the State's degree of culpability for the delay." *Id.* "Thus, the greater the State's bad faith or official negligence and the longer its actions delay a trial, the less a defendant must show actual prejudice or prove diligence in asserting his right to a speedy trial. *Id.*

## C. Standard of Review

In reviewing a trial court's ruling on a speedy trial claim, we use a bifurcated standard of review. *Cantu*, 253 S.W.3d at 282 (citing *Zamorano*, 84 S.W.3d at 648). We apply the deferential abuse of discretion standard to a trial court's determinations on factual issues, but we conduct a de novo review of its legal conclusions. *Id.* While review under the *Barker* factors involves both factual assessments and legal conclusions, the final balance of these factors is a purely legal question. *Id.*

Reviewing courts must view all of the evidence in the light most favorable to the trial court's ruling. *Id.* When reviewing factual issues, we presume the trial court resolved disputed fact issues in favor of the prevailing party, and we defer to reasonable inferences the record supports. *Cantu*, 253 S.W.3d at 282; *Zamorano*, 84 S.W.3d at 648. "In assessing the evidence at

a speedy-trial hearing, the trial judge may completely disregard a witness's testimony, based on credibility and demeanor evaluations, even if that testimony is uncontroverted." *Cantu*, 253 S.W.3d at 282. The trial judge is in the best position to make factual and credibility assessments and, consequently, he can "disbelieve any evidence so long as there is a reasonable and articulable basis for doing so." *Id.*

### D. Application of the Barker v. Wingo *Factors*

#### 1. Length of the Delay

The length of delay is the triggering mechanism for consideration of the other *Barker* factors, and to trigger a complete review the delay must be presumptively prejudicial. *Zamorano*, 84 S.W.3d at 648–49; *Russell v. State*, 90 S.W.3d 865, 872 (Tex. App.—San Antonio 2002, pet. ref'd). Although there is no set time for what amounts to a presumptively prejudicial delay, courts have generally held that a delay of eight months or longer will trigger a speedy trial analysis. *Zamorano*, 84 S.W.3d at 657 n.26; *Harris v. State*, 827 S.W.2d 949, 956 (Tex. Crim. App. 1992) (en banc); *Russell*, 90 S.W.3d at 872. Delay will run from the time the defendant is arrested or charged until the time of trial. *United States v. Marion*, 404 U.S. 307, 321 (1971); *Cantu*, 253 S.W.3d at 287; *Zamorano*, 84 S.W.3d at 648.

In this case, Simpson was arrested on April 4, 2009 and taken to trial on November 17, 2011. Over 31 months lapsed between Simpson's arrest and trial. This delay is sufficient to trigger a full speedy trial analysis. Once an accused has crossed the threshold of showing a presumptively prejudicial delay, courts must consider the length of delay beyond the triggering point because "the presumption that pretrial delay has prejudiced the accused intensifies over time." *Zamorano*, 84 S.W.3d at 649 (quoting *Doggett v. U.S.*, 505 U.S. 647, 652 (1992)) (internal quotation marks omitted). Thus, when considering prejudice we must take into account the effect of the length of delay.

2. Reasons for the Delay

As previously indicated, different weights are assigned to different reasons for delay. An intentional attempt by the prosecutor to delay trial in order to gain a tactical advantage is weighed heavily against the State, while more "neutral" reasons, such as docket overcrowding and negligence, are weighed less heavily against the State. *Zamorano*, 84 S.W.3d at 649 (quoting *Barker*, 407 U.S. at 531). Even in the absence of a bad-faith delay, negligence by the State is not "automatically tolerable simply because the accused cannot demonstrate exactly how it has prejudiced him." *Zamorano*, 84 S.W.3d at 649 (quoting *Doggett*, 505 U.S. at 656–57) (internal quotation marks omitted).

As the State points out in its brief, the delay appears to be the result of both parties' actions. The record reflects that Simpson failed to appear for a trial setting on January 11, 2010, which resulted in his confinement for the remainder of the time his trial was pending. There is no evidence whether or not the trial would have been conducted or postponed had Simpson appeared. However, because Simpson may have been able to have his trial at that early date and without lengthy incarceration, his failure to appear weighs against him. *See State v. Munoz*, 991 S.W.2d 818, 822 (Tex. Crim. App. 1999) (en banc) ("[D]elay which is attributable in whole or in part to the defendant may even constitute waiver of a speedy trial claim."); *Thorne v. State*, No. 03-02-00811-CR, 2003 WL 22409450, at *4 (Tex. App.—Austin Oct. 23, 2002, pet. dism'd) (not designated for publication) (attributing delay to a defendant who did not appear at her original trial setting). The record also reflects that Simpson was unable to appear at two trial dates because his counsel attended a funeral on one of the dates and was in another trial on the other date. These are more neutral reasons that should not weigh heavily, if at all, against Simpson. *See Barker*, 407 U.S. at 531. Simpson alleged that he "has requested settings for trial since November 6, 2009. He's always announced ready for trial. He's asserted his right to a

speedy trial at every opportunity." However, there is no evidence that Simpson requested a trial setting prior to his speedy trial motion or that he ever appeared and announced ready on any other dates. Additionally, Simpson claimed he waived his right to a jury trial "in order to try and expedite this matter and get this matter resolved," but there is no evidence in the record that he waived a jury trial for this reason.

After Simpson's missed appearance, the State's only reason for the subsequent twenty-two month delay that is detectable from the record is the State's desire to negotiate a plea with Simpson. In *State v. Munoz*, the Court of Criminal Appeals held that delay caused by good-faith plea negotiations was "a valid reason for the delay and should not be weighed against the prosecution." *Munoz*, 991 S.W.2d at 824–25. Part of the logic behind that decision was that the defendant's willing participation in the negotiations caused the delay to be equally attributable to the defendant as it was to the State. *Id.* The State contends it was in good-faith plea negotiations with Simpson's appointed counsel for the murder case, and we take the prosecutor's statement as evidence of that fact.[3] *See State v. Rangel*, 980 S.W.2d 840, 845 (Tex. App.—San Antonio 1998, no pet.) ("[A]n attorney's uncontested unsworn statement at a speedy trial hearing [is] evidence of the fact it asserted."). However, there is no evidence that Simpson or his counsel for this case knew or agreed to those negotiations or the strategy of disposing of the murder case and his co-defendant first. Simpson's counsel claimed Simpson was never willing to accept a plea and the State was simply delaying this case in hopes of pressuring Simpson into a plea bargain. We must also consider these assertions. The evidence is conflicting regarding whether the State was in a good-faith plea negotiation or a bad-faith

---

[3] Simpson was appointed a different attorney to represent him on the murder charge, and the State claimed that attorney agreed to handle this case after his co-defendant in the murder case was charged. The prosecution, however, conceded that Simpson's counsel in this case may not have been aware of these statements made by the other appointed counsel.

attempt to delay trial and force a plea, so we defer to the trial court's implicit finding that the State was not acting in bad faith. *Cantu*, 253 S.W.3d at 282. Although most of the reasons for delay are neutral, this factor weighs against Simpson for his initial failure to appear.

### 3. Assertion of the Right

A defendant "has no duty to bring himself to trial," but he is responsible for asserting his speedy trial right. *Cantu*, 253 S.W.3d at 283. There is no exact time in the process that a defendant must assert his right to a speedy trial, but "[a] lengthy delay or a lack of persistence in asserting the right attenuates a speedy trial claim." *Russell*, 90 S.W.3d at 873; *see also Zamorano*, 84 S.W.3d at 651. "Whether and how a defendant asserts this right is closely related to the other three factors because the strength of his efforts will be shaped by them." *Cantu*, 253 S.W.3d at 283. Whether or not the defendant asserts his right must be given strong evidentiary weight in a speedy trial analysis, particularly if multiple requests are made. *Cantu*, 853 S.W.3d at 283; *Zamorano*, 84 S.W.3d at 651.

In this case, Simpson filed a pro se motion for speedy trial with an attached request for a hearing on the motion. However, because the law does not permit hybrid representation, the trial court was not obligated to consider this motion since Simpson had already been appointed counsel. *Robinson v. State*, 240 S.W.3d 919, 922 (Tex. Crim. App. 2007). A little over three months later, Simpson's counsel filed a motion to dismiss the indictment for violating Simpson's right to a speedy trial. After this motion was filed, the trial court referred the case to a magistrate to rule on the pretrial motions.

Simpson did not assert his right to a speedy trial through his counsel until twenty-seven months after his initial arrest and seventeen months after his second arrest. "A lengthy delay in asserting the right attenuates a speedy-trial claim." *Russell*, 90 S.W.3d at 873 (citing *Haney v.*

*State*, 977 S.W.2d 638, 642 (Tex. App.—Fort Worth 1998, no pet.)). Consequently, this factor weighs against Simpson.

    4.  Prejudice to the Defendant

"Prejudice, of course, should be evaluated in the light of the interests of defendants which the speedy trial was designed to protect." *Zamorano*, 84 S.W.3d at 652 (quoting *Barker*, 407 U.S. at 532) (internal quotation marks omitted). The Supreme Court has articulated three particular interests: (1) preventing oppressive pretrial incarceration; (2) minimizing anxiety and concern of the defendant; and (3) limiting the chance that the defense will be hampered. *Barker*, 407 U.S. at 532; *Cantu*, 253 S.W.3d at 285. Of these types of prejudice, the third is the most serious and should be given the most weight; however, a defendant's claim will not fail simply because he is unable to demonstrate prejudice to his defense. *Zamorano*, 84 S.W.3d at 852. Still, the defendant must show he has suffered some prejudice to succeed on his speedy trial claim. *Russell*, 90 S.W.3d at 873.

In his brief, Simpson asserts that he has been prejudiced in four ways as a result of the delay in this case: (1) his pretrial incarceration was oppressive; (2) he was unable to locate witnesses who were with him immediately prior to his arrest and whose testimony would be exculpatory, and he was unable to help prepare his defense; (3) his memory and the memory of these alleged witnesses has now dimmed; and (4) he suffered substantial anxiety and concern regarding the pending charges as well as his loss of income. However, at the hearing on the motion, Simpson did not testify nor was any evidence presented in support of any of these assertions.

First, although the record is not clear on when Simpson was indicted for murder, it is undisputed that he was indicted at some point while his trial in this case was pending. The record reflects that Simpson's counsel for the murder case was appointed on June 9, 2010 so he

must have been indicted prior to that date. It follows that the majority of the time he was in jail while these charges were pending, he would have been in jail anyway awaiting trial for the murder charges. This presents a situation similar to that found in *Russell v. State*, where this court concluded that the defendant was not subjected to oppressive pretrial incarceration when he was already incarcerated on an unrelated matter. *Russell*, 90 S.W.3d at 873.

Next, "[t]o show prejudice caused by lost testimony, an appellant must show the witness was unavailable at the time of trial, the testimony that would have been offered was relevant and material to the defense, and due diligence was used to locate the witness for trial." *Id.* (citing *Swisher v. State*, 544 S.W.2d 379, 382 (Tex. Crim. App. 1976)). Simpson has shown none of these things. Instead, Simpson simply makes bare allegations that he lost contact with witnesses who would have been helpful. Simpson does not state who these witnesses were, what testimony he expected them to offer, or what efforts he used to try to reach them. Further, Simpson refused to identify his passenger to the police, and the passenger was the only person who could have been a witness with him immediately prior to his arrest. Since he failed to identify the passenger, there is no reason to believe he would have called him to appear in court as a witness. Additionally, because Simpson did not provide any evidence about what witnesses he may have called, he has not met his burden of showing that he was prejudiced by the memory loss of these unknown individuals. These general assertions do not rise to the level necessary to show prejudice.

Lastly, Simpson argues he suffered anxiety and concern about the pending charges as well as his loss of income. Simpson never presented the argument regarding his loss of income to the trial court, and on appeal he presents no evidence that he had a job or lost income. Additionally, regardless of these charges, Simpson would have been incarcerated while he awaited trial on the pending murder charge. As far as his anxiety and concern over pending

charges, the Court of Criminal Appeals has held that "general anxiety 'is at least some evidence of the type of anxiety that the Supreme Court considers under the prejudice prong of *Barker*.'" *Cantu*, 253 S.W.3d at 285–86. However, the court also stated that "evidence of generalized anxiety, though relevant, is not sufficient proof of prejudice under the *Barker* test, especially when it is no greater anxiety or concern beyond the level normally associated with a criminal charge or investigation." *Id.* Because Simpson presents only a general complaint of anxiety without testifying or providing any evidence supporting his claim, we conclude his assertion fails to satisfy the prejudice prong of *Barker*.

### E. Balancing the Factors

The length of delay weighs in Simpson's favor, even if the court considers only the length of delay after Simpson's missed appearance. The second factor, the reason for delay, weighs slightly against Simpson. This is because the first nine months of the delay are likely waived by Simpson's missed appearance, and at least some reasonable length of time to schedule a new trial after the missed appearance should be attributed to Simpson. The remainder of the delay before his trial can be attributed to both the State and Simpson. Simpson, through counsel, asserted his right to a speedy trial very late in the process. Due to the delay in asserting his right and the short time between his assertion and his trial, this factor weighs against Simpson. Finally, in relation to the fourth factor, Simpson has not shown sufficient prejudice as a result of the delay, so this factor also weighs against Simpson. After balancing the factors, we hold that Simpson has not sufficiently shown a violation of his right to speedy trial that would to entitle him to have the indictment set aside.

### CONCLUSION

We hold the evidence is sufficient to establish that Simpson was in possession of a firearm. Simpson has failed to preserve his alleged error regarding a denial of due process.

Finally, we hold that Simpson has not established a speedy trial violation. Based on these holdings, we affirm the judgment of the trial court.

Catherine Stone, Chief Justice

DO NOT PUBLISH